UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| CLEAN COATING INVESTMENT FUND I, LLC and CLEAN COATING INVESTMENT FUND II, LLC,<br><br>     Plaintiffs,<br>v.<br><br>XTI02, INC.,<br><br>     Defendant. | Civil Action No. _____<br><br>JURY TRIAL DEMANDED |

# **COMPLAINT**

The Plaintiffs, Clean Coating Investment Fund, I, LLC ("CCIF I") and Clean Coating Investment Fund II, LLC ("CCIF II" and together with CCIF I, "Plaintiffs"), by their undersigned attorney, file this Complaint against the Defendant, XTI02, Inc. (the "Defendant"), and in support hereof allege as follows:

## **PARTIES**

1. Plaintiffs are Connecticut limited liability companies whose principal place of business is located at 10 Middle Street, 15th Floor, Bridgeport, CT. Plaintiffs' members reside in multiple states in the United States.

2. Defendant is a foreign corporation organized under the laws of Taiwan, with a principal business address located at No. 126, Sec. 2, Minsheng East Road, 2nd Floor, Taipei, Taiwan.

3. Non-party American PPE & Coating Services, Inc. ("APPE") is a Delaware Corporation. Defendant and Defendant's largest shareholder, Martin Pierce Hsu, are founding shareholders of APPE and collectively own sixty percent (60%) of the common stock of APPE. During all relevant times, Defendant controlled APPE. Defendant is an "insider" of APPE within the meaning of § 1301(7) of the Delaware Uniform Fraudulent Transfer Act.

4. Plaintiffs are passive investors in APPE. Plaintiffs do not have any voting rights in APPE other than the right to elect one out of APPE's four or five directors.

**JURISDICTION, VENUE AND NATURE OF THIS PROCEEDING**

5. This complaint initiates an action (i) pursuant to 28 U.S.C §§ 2201-2202 for a declaratory judgment determining that two alleged liens on personal property are not valid; (ii) in the alternative, to avoid certain alleged liens on APPE's property under the Delaware Uniform Fraudulent Transfer Act, Delaware Code Title 6, Chapter Thirteen ("DUFTA"); and (iii) to avoid certain obligations ostensibly owing from APPE to Defendant.

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) based on diversity of citizenship as the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and because the Plaintiffs are citizens of various states in the United States and Defendant is a citizen of a foreign state.

7.      Venue of this action in the District of Delaware is proper pursuant to 28 U.S.C. § 1391(b)(2), because the financing statements purportedly perfecting the alleged liens at issue were recorded with the Delaware Secretary of State, APPE is a Delaware Corporation, and the shareholder agreement to which Plaintiffs and Defendant are parties contains a Delaware forum selection clause.

## FACTS

8.      Upon information and belief, Defendant is the creator and producer of a product known as XTI-360.  XTI-360 is a solution that adheres to virtually any surface for at least one year and kills viruses and bacteria that come into contact with it.

9.      Upon information and belief, other than Defendants' relationship with APPE, Defendant operates entirely outside of the United States.

10.     In the Spring of 2020, Defendant began contemplating the possibility of forming a United States based entity to manufacture and sell personal protective equipment ("PPE") coated with XTI-360 and to market and sell XTI-360 in the United States.

11.     At that time, Defendant had a pre-existing business relationship with non-party Michael Holbert ("Holbert").  Holbert had been attempting to market XTI-360 in the United States for approximately one decade as of the Spring of 2020.  At that time, Holbert also had a pre-existing business relationship with Joel

M. Hartstone ("Hartstone"). Holbert introduced Hartstone to Defendant and its largest shareholder.

12. In the Spring of 2020, Hartstone approached Aaron Romney ("Romney"), who later became a member and manager of CCIF I and CCIF II, to solicit his interest in investing in the entities that later became APPE and its sister company, American CleanCoating Company ("ACC"). Romney had a pre-existing relationship with Holbert and Hartstone, and Romney had introduced the two of them to each other years earlier.

13. The ownership structures of APPE and ACC are identical to each other. Defendant and its largest shareholder collectively own sixty percent (60%) of each company.

14. The sole purpose of APPE and ACC was to distribute Defendants' products in the United States.

15. At all times, Defendant controlled APPE and ACC.

16. Defendant agreed to allow Hartstone to become the initial Chief Executive Officer of APPE and ACC. Defendant agreed to allow Holbert to become the initial Chief Operating Officer of APPE and ACC.

17. Defendant and its largest shareholder dictated (i) how much equity they received in APPE and ACC (for no consideration), (ii) how much equity Hartstone and Holbert received in APPE and ACC (for serving as officers), and

(iii) how much equity APPE and ACC could offer to prospective investors and on what terms.

18. Defendant's largest shareholder sits on APPE's and ACC's board of directors and was involved in its day-to-day decision making. Defendant and its employees directed APPE's and ACC's day-to-day management and decision-making.

19. In the Fall of 2020, CCIF I Invested $1,500,000 in APPE and ACC in exchange for a fifteen percent (15%) common equity interest of each company (the "CCIF I Investment").

20. CCIF I made its investment relying on a number of materials, including, but not limited to, (i) a disclosure statement dated September 23, 2020; (ii) a letter of intent (the "LOI"), dated September 12, 2020 between and among APPE, ACC, Defendant, Holbert, and Hartstone, pursuant to which, without limitation, Defendant agreed to supply APPE and ACC with substantial credit-financing, products and materials to create one or more facilities for APPE to manufacture PPE and for ACC to distribute XTI-360 in the United States; and (iii) an agreement, dated September 23, 2020, between and among APPE, ACC, Defendant, Holbert, and Hartstone, pursuant to which they agreed to proceed "substantially as provided in the LOI."

21. Upon information and belief, Defendant dictated the terms of the LOI.

22. On or about October 17, 2020, APPE and Defendant entered into a sales agreement pursuant to which APPE ostensibly agreed to purchase (i) an automated assembly line to manufacture PPE that ostensibly included "one of its kind" technology that Defendant ostensibly had created (the "PHL-1") for $600,000, (ii) 200 kilograms of XTI-360 for $200,000; and (iii) and additional materials to be used to manufacture PPE for an additional $300,000.

23. Defendant dictated the terms of the sales agreement and exercised control over APPE at the time the sales agreement was executed.

24. For the items mentioned above, APPE paid $900,000 in cash, all of which consisted of funds received from CCIF I. Defendant ostensibly agreed to accept the remaining $200,000 of the ostensible purchase price that APPE ostensibly owed to Defendant under the terms of the sale agreement in the form of debt (the "PHL-1 Indebtedness").

25. In late December 2020, before the PHL-1 had arrived at APPE's facility in Pennsylvania from Defendant's facility in Taiwan, and before APPE or ACC had conducted any operations, Defendant informed APPE through Hartstone and Holbert that (i) Defendant could provide APPE with a second assembly line (the "X3D") to manufacture a different type of PPE (three dimensional facemasks), (ii) the X3D possessed automated technology that Defendant ostensibly had created and ostensibly was the only one of its kind, and (iii) if APPE did not buy

the X3D virtually immediately, Defendant was uncertain when/if another automated assembly line of that type would become available.

26. Defendant also stated to APPE that if APPE purchased the X3D, the machine could be delivered by February of 2021.

27. On December 28, 2020, APPE and Defendant entered into an agreement pursuant to which APPE would purchase from Defendant the X3D and various other materials to make PPE. The purchase price of the X3D ostensibly was to be $800,000 and the purchase price of the other materials was to be $600,000, for a total of $1.4 million.

28. Defendant dictated the terms of this agreement and exercised control over APPE at the time this agreement was executed.

29. For the items mentioned above, APPE paid $1.1 million in cash, all of which consisted of funds received from Plaintiffs. Defendant ostensibly agreed to accept the remaining $300,000 of the purchase price that APPE ostensibly owed to Defendant under the terms of sale Agreement in the form of debt (the "X3D Indebtedness," and with the PHL-1 Indebtedness, the "Indebtedness").

30. In January of 2021, CCIF II invested an additional $1,500,000 in APPE and ACC in exchange for an additional five percent (5%) equity interest in APPE and ACC (the "CCIF II Investment"). Similar to the CCIF I Investment, the vast majority of the proceeds from the CCIF II Investment was utilized to buy the

X3D and the other PPE materials pursuant to the second sale agreement between APPE and Defendant.

31. CCIF II made its investment relying on an information statement dated January 10, 2021 (the "January 10 Information Statement"). Among other things, the January 10 Information Statement claims that

> APPE owns the world's most advanced, automated assembly line ("Line One") [i.e., the PHL-1] for the production of flat, surgical style, medical grade, face masks ("Flat Masks"). . . . Line One was custom designed and fabricated for APPE in Taiwan by an affiliated company, XTI02, Inc. ("XTI") [i.e., Defendant]. . . Line One, which produces and individually (plastic) bags over two million, StaClean, XTI-360 coated, Flat Masks per month, requires only one operator per shift. The Companies expect to ramp up production from a rate of one million Flat Masks in January 2021, to a rate of two million Flat Masks in February 2021 and thereafter.

32. The January 10 Information Statement further described the opportunity to buy the X3D (referred to therein as "Line 2") as "momentary" and further stated:

> In the event that the Companies fail to make [payment for the X3D] and no extension for such payment is granted by [Defendant], Line 2 will be immediately placed into production in Taiwan. Once registered in Taiwan, with production commenced, Line Two cannot be sold to APPE without government approvals and it will be late April, at the earliest, before another 3D assembly line could be ready to ship.

33. The January 10 Information Statement further stated that "[i]f [APPE] acquires Line Two, it would be operational in Bensalem [Pennsylvania] around February 15, 2021."

34. Contrary to the statements in the January 10 Information Statement, the PHL-1 (i.e., "Line One") was not operational, was not producing masks at a rate of one million or two million masks per month, never had supplies to make one million (much less two million) XTI-coated flat masks, and to this day has not made anywhere near one million flat masks.

35. Despite the fact that the PHL-1 arrived in Pennsylvania in December, 2020, to date APPE has rarely operated it. Upon information and belief, the PHL-1 has created fewer than 20,000 units to date and has sold none of them.

36. Despite the rush for APPE to purchase the X3D (for which it obtained funding from CCIF II to do so), XTI did not deliver the X3D to the United States until July of 2021.

37. Moreover, APPE did not set up the X3D until December of 2021, when members of CCIF I and CCIF II loaned APPE an additional $30,000 to pay two technicians from Taiwan to travel to the United States to set up the X3D and perform maintenance on the PHL 1. At no time before either of the Plaintiffs invested in APPE were they informed that the PHL-1 or X3D might require the assistance of Taiwanese technicians in order to be operational in the United States.

38. To date, APPE has sold virtually none of the masks produced on the PHL-1 or X3D (and has made virtually no attempt to do so), and virtually all PPE

that APPE has produced was produced during the two-week period when the Taiwanese techs were onsite at APPE's facility in December 2021.

39. To this day, APPE and ACC have not begun the operations for which they were intended and for which they raised approximately $3 million from Plaintiffs. APPE and ACC have never sold any XTI-360 solution and their gross revenues from sales of PPE amount to only several thousand dollars.

40. Moreover, the few PPE sales that APPE has consummated were of PPE that was purchased from Defendant and manufactured outside of the United States. None, or virtually none, of those sales were of PPE that was manufactured by APPE in the United States on the PHL 1 or X3D.

41. In late March of 2021, Defendant and Defendant's largest shareholder had a falling out with Hartstone and Defendant insisted that APPE and ACC terminate Hartstone, or else XTI would terminate its relationship with APPE and ACC. After Hartstone was terminated, Holbert answered solely to Defendant and Defendant exercised complete control over APPE and ACC.

42. In addition, Defendant insisted that APPE and ACC focus their efforts on negotiating a separation agreement with Hartstone, rather than on starting to operate the business for which they were intended or on generating revenue. Simply stated, Defendant was unwilling to operate and create value in APPE or ACC while Hartstone continued to own an interest in either entity. As a result,

APPE and ACC never began conducting the business for which they were intended.

43. In late April of 2021, Defendant exercised its control over APPE to require that APPE file a UCC-1 financing statement to perfect an alleged lien on the PHL-1 to secure the $200,000 that Defendant claimed to have financed in connection with the October 17, 2020 transaction. That financing statement was filed with the Delaware Secretary of State on April 29, 2021.

44. In May of 2021, Defendant exercised its control over APPE to require that APPE file a UCC-1 financing statement to perfect an alleged lien on the X3D to secure the $300,000 that Defendant claimed to have financed in connection with the December 28, 2020 transaction. That financing statement was filed with the Delaware Secretary of State on May 19, 2021.

45. To the best of Plaintiffs' knowledge, no written security agreement was ever executed by APPE to convey or otherwise attach liens on the PHL-1 or the X3D in Defendant's favor.

46. In November of 2021, after Defendant had spent approximately six months compelling APPE and ACC to focus their efforts on obtaining a release of Hartstone's interest and voting rights in APPE and ACC, three of CCIF I and CCIF II's members reached a proposed agreement in principle (the "Proposed

Settlement") with Hartstone to purchase Hartstone's interest in APPE and ACC at their own expense.

47. The Proposed Settlement would have required various parties to exchange mutual releases, including ACC and APPE, on the one hand, and Hartstone, on the other hand.

48. In addition, the Proposed Settlement permitted, but did not require, Defendant and its largest shareholder to participate in the releases. Specifically, despite the fact that Defendant would not have provided any consideration to anyone under the Proposed Settlement, Defendant was given the option of (i) providing Hartstone with a general release and receiving a general release from Hartstone; or (ii) not providing Hartstone with a release of any kind and not receiving a release of any kind from Hartstone.

49. Defendant, which exercised complete control over APPE at the time, refused to allow APPE to enter into the transaction unless Hartstone provided Defendant and its largest shareholder with general releases. However, Defendant and its largest shareholder refused to provide Hartstone with a release of any kind. As a result, the Proposed Settlement was never consummated.

50. Thus, after insisting that APPE obtain an agreement from Hartstone to relinquish his interest in APPE before APPE could begin its operations in earnest, Defendant unilaterally precluded APPE from entering into an agreement with

Hartstone that would have required Hartstone to relinquish his interest in APPE at no expense to APPE or Defendant.

51. To this date, APPE and ACC have not conducted any meaningful operations and have exhausted their remaining cash.

52. Upon information and belief, ACC has not engaged in a single transaction.

53. The only meaningful transactions that APPE has entered into were the purchase of materials from Defendant pursuant to the October 17, 2020 and December 28, 2020 Agreements using money that APPE received from CCIF I and CCIF II.

54. For the foregoing reasons, including, but not limited to, the facts that (i) APPE and ACC never operated for the purpose for which they were intended, (ii) the only material transactions that they entered into were purchase transactions from Defendant at prices and terms dictated by Defendant; and (iii) Defendant at all times controlled APPE and ACC, CCIF I and CCIF II are entitled to rescind their investments in APPE and ACC.

55. Moreover, CCIF II is entitled to rescind its investment based on the fact that the January 10 Information Statement falsely stated that the PHL-1 was operational and producing PPE at a rate of at least one million flat masks per month.

56. By virtue of their right to rescind their investments, CCIF I and CCIF II are creditors of APPE and ACC.

### COUNT ONE: DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201-2002 THAT THE ALLEGED LIENS ON THE PHL-1 AND X3D ARE INVALID

57. Plaintiffs incorporate paragraphs 1 through 56 as if fully set forth herein.

58. Plaintiffs are creditors of APPE and ACC by virtue of their rescission claims.

59. Defendant has repeatedly asserted that it is a secured creditor of APPE because of the alleged liens on the PHL-1 and the X3D (collectively, the "Alleged Liens").

60. APPE never executed a valid security agreement pursuant to which APPE granted Defendant liens on the PHL-1 and the X3D.

61. Although the financing statements purported to perfect the Alleged Liens, those liens never existed and were incapable of being perfected.

62. The attempted perfection of the Alleged Liens clouds the title of the PHL-1 and X3d, which would otherwise be available to Plaintiffs in support of their claims.

63. Thus, there exists an actual, bona fide, and substantial issue in controversy regarding the existence and validity of the Alleged Liens.

64. Therefore, Plaintiffs are entitled to entry of a Declaratory Judgment that the Alleged Liens are invalid and do not encumber the PHL-1 and X3D.

### COUNT TWO: CONSTRUCTIVE FRAUDULENT TRANSFER TO AVOID THE ALLEGED LIENS PURSUANT TO 6 DEL CODE. § 1305(b)

65. Plaintiffs incorporate paragraphs 1 through 56 as if fully set forth herein.

66. To the extent that the Alleged Liens constitute a valid and perfected security interest in the PHL-1 and X3D, the Alleged Liens were transfers of APPE's property for which APPE received no contemporaneous value.

67. At the time APPE allegedly granted the Alleged Liens to Defendant, Defendant was an insider of APPE.

68. At the time APPE allegedly granted the Alleged Liens to Defendant, APPE was insolvent.

69. At the time APPE allegedly granted the Alleged Liens to Defendant, Defendant had reasonable cause to believe that APPE was insolvent.

70. To the extent that the Alleged Liens constitute a valid and perfected security interest in the PHL-1 and X3D, creation of the Alleged Liens were constructive fraudulent transfers within the meaning of 6 Del. Code. § 1305.

71. Plaintiffs are creditors of APPE.

72. Therefore, Plaintiffs are entitled to entry of a judgment avoiding the Alleged Liens.

### COUNT THREE: CONSTRUCTIVE FRAUDULENT TRANSFER TO AVOID THE ALLEGED LIENS PURSUANT TO 6 DEL CODE. §§ 1304(a)(2) and 1305(a)

73. Plaintiffs incorporate paragraphs 1 through 56 as if fully set forth herein.

74. When APPE allegedly granted the Alleged Liens to Defendant, Defendant was an insider of APPE.

75. When APPE allegedly granted the Alleged Liens to Defendant, APPE was insolvent.

76. When APPE allegedly granted the Alleged Liens to Defendant, APPE was engaged or was about to engage in business for which its remaining assets were unreasonably small in relation to APPE's business.

77. When APPE allegedly granted the Alleged Liens to Defendant, APPE believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

78. Defendant did not provide APPE with reasonably equivalent value for the Alleged Liens.

79. To the extent that the Alleged Liens constitute a valid and perfected security interest in the PHL-1 and X3D, creation of the Alleged Liens were

constructive fraudulent transfers within the meaning of 6 Del. Code. §§ 1304(a)(2) and 1305(a).

80. Plaintiffs are creditors of APPE.

81. Therefore, Plaintiffs are entitled to entry of a judgment avoiding the Alleged Liens.

### COUNT FOUR: CONSTRUCTIVE FRAUDULENT TRANSFER TO AVOID THE DISPUTED OBLIGATIONS UNDER 6 DEL CODE. §§ 1304(a)(2) and 1305(a)

82. Plaintiffs incorporate paragraphs 1 through 81 as if fully set forth herein.

83. Defendant controlled APPE during all relevant times.

84. Defendant exercised its control over APPE to cause APPE to allegedly incur obligations to Defendant for (i) an additional $200,000 for the PHL-1 beyond the $400,000 in cash that APPE paid to Defendant; and (ii) an additional $300,000 for the X3D beyond the $500,000 in cash that APPE paid to Defendant (collectively, the "Disputed Obligations").

85. When APPE incurred the Disputed Obligations to Defendant, Defendant was an insider of APPE.

86. When APPE incurred the Disputed Obligations to Defendant, APPE was insolvent.

87. When APPE incurred the Disputed Obligations to Defendant, APPE was engaged or was about to engage in business for which its remaining assets were unreasonably small in relation to APPE's business.

88. When APPE incurred the Disputed Obligations to Defendant, APPE believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

89. Defendant did not provide APPE with reasonably equivalent value for the Disputed Obligations.

90. The Disputed Obligations were constructive fraudulent transfers within the meaning of 6 Del. Code. §§ 1304(a)(2) and 1305(a).

91. Plaintiffs are creditors of APPE.

92. Therefore, Plaintiffs are entitled to entry of a judgment avoiding the Disputed Obligations.

## RESERVATION OF RIGHTS

93. Plaintiffs reserve the right to amend this Complaint to include further parties and/or further causes of action.

WHEREFORE, the Plaintiffs request that this Court enter an Order of Judgment:

1) Declaring the Alleged Liens void and of no valid effect to encumber the PHL-1 and the X3D set fort in Count One.

    2)      Avoiding the Alleged Liens as set forth in Counts Two and Three;

    3)      Avoiding the Disputed Obligations as set forth in Count Four;

    4)      Costs as to all Counts; and

    5)      Such other and further relief as the Court may deem necessary, proper and just.

Dated: April 28, 2022  
         Wilmington, Delaware

Respectfully submitted,

HILLER LAW, LLC

 /s/ Adam Hiller  
Adam Hiller (DE No. 4105)  
300 Delaware Avenue, Suite 210, #227  
Wilmington, Delaware 19801  
(302) 442-7677 telephone  
ahiller@adamhillerlaw.com

*Attorney for Clean Coating Investment Fund, I, LLC and Clean Coating Investment Fund II, LLC*

-20-

## JURY DEMAND

Plaintiffs hereby demand a jury trial on all justiciable counts of this Complaint.

                HILLER LAW, LLC

                 **/s/ Adam Hiller**
                Adam Hiller (DE No. 4105)
                300 Delaware Avenue, Suite 210, #227
                Wilmington, Delaware 19801
                (302) 442-7677 telephone
                ahiller@adamhillerlaw.com